**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| **FLORIDA POWER CORPORATION** <br> **d/b/a PROGRESS ENERGY FLORIDA,** <br> **INC.,** <br>         **Plaintiff,** <br>    vs. <br> **FIRST ENERGY CORP.** <br><br>         **Defendant.** | Case No. 1:12 CV 1839 <br><br> Judge Dan Aaron Polster <br><br> <u>**OPINION AND ORDER**</u> |

**I. Factual Background**

Plaintiff Florida Power Corporation d/b/a Progress Energy Florida, Inc., ("Progress Energy") brought this action under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 94 Stat. 2767, 42 U.S.C. §§ 9601-9675, to recover cleanup costs it has incurred in connection with the release of hazardous substances on property located in Orlando and Sanford, Florida (together the "Sites", individually the "Orlando Site" or "Sanford Site"). Progress Energy did not own the Sites when the hazardous substances were released, nor did it release the hazardous substances. Nonetheless, as a former owner of the Sites it is a "Potentially Responsible Party" ("PRP") and is therefore responsible for the cleanup costs under CERCLA. Progress Energy can, however, recoup those costs from other PRPs, including parties who, at the time hazardous material substances were released, owned either the Orlando Site or the Sanford Site. Progress Energy alleges that Defendant First Energy Corp. ("First Energy") is such a party.

First Energy, which is the corporate successor to the Associated Gas & Electric Company ("AGECO"), did not own either the Orlando Site or the Sanford Site when the hazardous materials were released. Rather, from 1924 until 1943, the Florida Public Service Company ("FPSC") owned the Orlando Site and, from 1932 until 1943, Sanford Gas Company ("Sanford Gas") owned the Sanford Site. Both the FPSC and Sanford Gas owned and operated a manufactured-gas plant at the respective Sites, during which they released hazardous substances. AGECO's connection to Sanford Gas is relatively direct; Plaintiff alleges that in 1930 AGECO acquired Sanford Gas. AGECO's connection to FPSC is more complex. At the time that FPSC owned the Orlando Site, FPSC was a subsidiary of General Gas & Electric Corporation ("General Gas"). General Gas, in turn, was a subsidiary of Associated Gas & Electric Corporation, which was itself a subsidiary of AGECO, the predecessor company of Defendant First Energy. Progress Energy alleges that AGECO's officers and directors persistently disregarded the corporate form, exercising complete dominance and control over FPSC and Sanford Gas. Plaintiff therefore seeks to pierce the corporate veil and hold AGECO responsible for FPSC and Sanford Gas.

On December 5, 2012, First Energy filed a Motion for Judgment on the Pleadings pursuant to Fed. R. Civ. P. 12(c) on two grounds ("Motion for Judgment on the Pleadings") (Doc. # 56). First, First Energy argued that Progress Energy did not properly allege facts to support its veil piercing theory, and second, First Energy argued that even if Progress Energy had done so, its claims under CERCLA were barred by the applicable statute of limitations. On March 18, 2013, this Court issued an Opinion and Order ("March 18 Order") denying the motion

on both grounds  (Doc. # 59).[1]  Now, First Energy has filed a Motion for Reconsideration asking the Court to reconsider its ruling that Progress Energy's claims are not barred by the applicable statute of limitations (Doc. # 84).

## II. Law & Analysis

While a motion for reconsideration is not mentioned in the Federal Rules of Civil Procedure, it is typically treated as a motion to alter or amend the judgment under Fed. R. Civ. P. 59(e)**.**  *U.S. v. Rohner,* 2014 WL 4809454, *1 (Sept. 26, 2014) (citations omitted).  "Generally, there are three major situation which justify a court reconsidering one of its orders: (1) an intervening change in controlling law; (2) the availability of new evidence; and (3) the need to correct clear error or to prevent manifest injustice." *Id.* (citation and internal quotation omitted).

Here, First Energy's Motion for Reconsideration is based upon the Sixth Circuit's decision in *Hobart Corporation v. Waste Management of Ohio, Inc.*,758 F.3d 757 (6th Cir. July 14, 2014).  According to First Energy, *Hobart* is "new and binding Sixth Circuit precedent"and is therefore "an intervening change in controlling law."  The Court agrees.

The question of whether or not a PRP's action to recover cleanup costs from other PRPs is time-barred under CERCLA depends on what kind of action a PRP is bringing.  As the Court explained in its March 18 Order, the statute of limitations under CERCLA depends upon

---

[1] In support of its veil-piercing theory, Plaintiff relied on an opinion out of the Western District of New York, *Rochester Gas & Elec. Corp. v.GPU, Inc.,* 2008 WL 8912083 (W.D.N.Y. Aug. 8, 2008), a CERCLA case with similar facts to this one.  There, the plaintiff was also seeking reimbursement from First Energy for cleanup costs it incurred at several manufactured-gas plants, albeit in New York.  Because the tortious conduct occurred at the hands of subsidiary companies several levels removed from First Energy, the Court first had to decide whether to pierce to corporate veil.  After considering the evidence, the court  held AGECO liable for the environmental contamination caused by one of its New York subsidiaries.  While this case  involves different subsidiaries, the Court, relying on *Rochester Gas,* found that the facts alleged by Plaintiff made it plausible that AGECO  had abused the corporate structure with respect to FPSC and Sanford Gas.

whether a PRP is bringing a cost-recovery action pursuant to § 107(a)(4)(B), 42 U.S.C. § 9607(a)(4)(B), or a contribution action pursuant to § 113(f), 42 U.S.C. § 9613(f):

> CERCLA provides two avenues through which private parties may recoup expenses associated with cleaning up contaminated sites. One is a cost-recovery action. 42 U.S.C. § 9607(a). The other is a contribution action. 42 U.S.C. § 9613(f). These two remedies complement each other but apply to parties in different procedural circumstances. *United States v. Atl. Research Corp.*, 551 U.S. 128, 139 (2007). A cost-recovery action is the way a party recovers cleanup costs it has voluntarily incurred. *Id.* A contribution action, by contrast, is the way a party seeks reimbursement for money it has paid to other parties to satisfy a settlement agreement or court judgment. *Id.*
>
> The statute of limitations for a contribution action is straightforward. Such action must be commenced within three years of the "entry of a judicially approved settlement with respect to such costs or damages." 42 U.S.C. § 9613(g)(3). A consent decree constitutes a judicially approved settlement. *RSR Corp. v. Commercial Metals Co.*, 496 F.3d 552, 556 (6th Cir. 2007).
>
> The statute of limitations for cost-recovery actions is slightly more complex. There are two types of cost-recovery actions: removal and remedial. In essence, a removal action is taken to prevent or temporarily correct an immediate threat and is intended to be a short-term solution. 2 SUPERFUND & BROWNFIELDS CLEANUP § 17:1 (2012). The Sixth Circuit has held that a remedial investigation/feasability study is a type of removal action. *Kelley v. E.I. DuPont De Nemours & Co.*, 17 F.3d 836, 840 (6th Cir. 1994). A remedial action is a longer-term or permanent solution. 2 SUPERFUND & BROWNFIELDS CLEANUP § 17:1 (2012).
>
> A lawsuit to recover costs incurred for a removal action must be commenced within three years after completion of the removal. 42 U.S.C. § 9613(g)(2)(A). A lawsuit to recover costs for a remedial action must be commenced within six years "after initiation of physical on-site construction of the remedial action...." *Id.* at (g)(2)(B). (Doc. # 59 at 6-7).

In *Hobart*, the Sixth Circuit recognized that "navigating the interplay" between a cost-recovery action under § 107(a) and a contribution action under § 113(f) "is not always easy." *Hobart,* 758 F.3d at 766-67. The reason for this is that there are situations in which "PRPs do not voluntarily incur expenses or involuntarily reimburse another entity" but, rather,

-4-

do both. *Id.* For instances, in *Hobart*, the Sixth Circuit noted that the appellants, the party seeking to recover cleanup costs, directly paid for a Remedial Investigation and Feasibility Study ("RI/FS"), incurring an expense, but they commissioned the study only because they were obligated to do so pursuant to an agreement they entered into with the government. *Id.* Although the Sixth Circuit recognized that it is not always the case that a PRP either voluntarily or involuntarily incurs expenses,–"the dichotomy upon which the [cost-recovery/contribution] divide seems to operate" -- it held that § 107(a) and 113(f) provide mutually exclusive remedies and that a party may not choose under which section to bring a CERCLA action. *Id.* Rather, if a PRP meets one of § 113(f)'s "statutory triggers" it must bring a contribution action, rather than a cost-recovery action under § 107(a). *Id.* at 768-69. Section 113(f)(3)(B) provides that "[a] person who has resolved its liability to the United States... for some or all of a response action or for some or all of the costs of such action in an administrative or judicially approved settlement agreement may seek contribution from any [PRP] who is not a party to [the] settlement." Thus, a PRP meets a "statutory trigger" under § 113(f)(3)(B) if it enters into "an administrative or judicially approved settlement." *See Hobart,* 758 F.3d at 769 (concluding that "a PRP, which has entered into an administrative settlement with the government, thereby having met a statutory trigger for filing a contribution action, can only bring a § 113(f)(3)(B) action for contribution"). In *Hobart*, the appellants entered into an agreement titled "Administrative Settlement Agreement and Order on Consent" ("*Hobart* ASAOC") with the U.S. Environmental Protection Agency ("EPA"). Therefore, the question before the Sixth Circuit was whether the ASAOC was an "administrative settlement" under § 113(f)(3)(B).

-5-

Here, too, Progress Energy entered into agreements with the EPA for the Orlando Site and the Sanford Site.  The Court described both agreements in its March 18 Order:

> Progress Energy started its cleanup efforts when it entered into a written agreement with the U.S. Environmental Protection Agency ("EPA") in 1998. The agreement addressed the release of hazardous substances on the Sanford site and was titled "Administrative Order by Consent for Remedial Investigation/Feasibility Study." (Doc. # 25-1). The purpose was twofold: to determine the nature and extent of the release of hazardous substances; and to develop a plan for cleanup and prevention. (Id.). Following completion of the investigation and study, the EPA issued three Records of Decision ("RODs") for the remediation—one in 2000, another in 2001, and a third in 2006. The next step was the negotiation of a consent decree for the actual performance of the remediation. The consent decree was approved by the U.S.District Court for the Central District of Florida on January 16, 2009.
> In September 2003, Progress Energy, along with other former owners and operators,entered into a similar agreement with the EPA for the Orlando site. (Doc. # 25-3). In 2008, the group submitted a draft Remedial Investigation Report, Risk Assessment, and Remedial Alternative Technical Memo. This memo is currently being reviewed by the EPA.  (Doc. # 59 at 5-6).

In the parties' briefs on First Energy's Motion for Judgment on the Pleadings, they appeared to agree that, as to the Sanford Site, First Energy was bringing a § 113(f) contribution action.  However, the parties disputed when the three-year statute-of-limitation clock began to run.  First Energy claimed that the clock began to run when Progress Energy entered into the "Administrative Order by Consent for Remedial Investigation/Feasibility Study" ("AOC")  with the EPA in April of 1998, whereas Progress Energy argued that the clock began to run when the consent decree was approved by the U.S. District Court for the Central District of Florida on January 16, 2009.  In its March 18 Order, the Court agreed with Progress Energy, holding that the AOC was neither a settlement nor judicially approved and therefore the consent decree started the three-year statue of limitations clock.  As to the Orlando Site, the parties disputed

-6-

what kind of action Progress Energy could bring. First Energy argued that the 2003 AOC was a settlement agreement under § 113(f)(3) and therefore the only action that Progress Energy could bring was a contribution action. The Court disagreed, holding that because the 2003 AOC was not a settlement agreement under § 113(f)(3), a cost-recovery action under § 107(a) was Progress Energy's only viable claim.

In the instant Motion for Reconsideration that is pending before the Court, First Energy contends that under the Sixth Circuit's decision in *Hobart* the Court must find that both the 1998 Sanford AOC and the 2003 Orlando AOC are "administrative settlements"[2] under § 113(f)(3). The Court agrees.

In *Hobart,* the Sixth Circuit held that an agreement is an "administrative settlement" under § 113(f)(3)(B) if it "'resolve[s] [the PRP's] liability to the United States or a State for some or all of a response action or for some or all of the costs of such action...'" *Hobart,* 758 F.3d at 768 (quoting §113(f)(3)(B) and citing *ITT Indus., v. BogWarner, Inc.,* 506 F.3d 452, 459 (6th Cir. 2007). The court in *Hobart* pointed to four "aspects of the ASAOC that indicate[d] that the parties intended for the ASOAC to resolve Appellants' liability with the government": 1) the ASAOC stated that it resolved the appellants' liability to the United States; 2) the ASAOC stated

---

[2] In its brief in support of its Motion for Reconsideration, First Energy does not analyze the Sanford AOC because it contends that Progress Energy has to concede that the Sanford AOC is an "administrative settlement" since it brought a 113(f) contribution claim as to the Sanford Site. Although the Court agrees with First Energy that the Sanford Site is an "administrative settlement," it does not agree that in bringing a 113(f)contribution action, Progress Energy must necessarily be conceding that the Sanford AOC is an "administrative settlement." The Court reads the *Hobart* decision as requiring a party to bring a contribution action if it meets a "statutory trigger," and that a "statutory trigger" could be an "administrative or judicially approved settlement." *See* § 113(f)(3)(B). Thus, the Court has considered whether or not the Sanford AOC is an "administrative settlement" under § 113(f)(3)(B). Here, Progress Energy's contribution action, as to the Sanford Site, was "triggered" when it entered into the 1998 Sanford AOC, an "administrative settlement," because the *Hobart* decision requires parties to bring a contribution action if it enters into an "administrative settlement." *Hobart,* 758 F.3d at 769.

that the appellants would receive protection from contribution actions; 3) the parties titled the ASAOC an "Administrative Settlement Agreement and Order on Consent;" and 4) the ASAOC contained a covenant not to sue or to take administrative action against the appellants pursuant to §§ 106 and 107(a) of CERCLA.  *Id.*

While the Orlando and Sanford AOCs are not identical to the ASAOC in *Hobart,* there are certain defining features of the agreements that indicate that they resolved at least some of Progress Energy's liability to the EPA for a "response action."  First, the Orlando and Sanford AOCs state that Progress Energy and other parties (together "PRPs") have resolved their liability to the EPA.  The Orlando and Sanford AOCs provide, in relevant part:  "Following satisfaction of the requirements of this Consent Order,[the PRPs] shall have resolved their liability to EPA for the performance of the RI/FS that is the subject of this Order."  (Sanford AOC, at 18; Orlando AOC, at 21).  A RI/FS study is a "response action" under CERCLA.  *See Hobart,* 758 F.3d at 767 (explaining that CERCLA defines "response" to include "removal actions" and that the "expense of a RI/FS fits within [the definition of removal'").  The ASAOC in *Hobart* contained similar language.  There, the parties agreed that the appellants had, "as of the effective date *resolved their liability* to the United States for the Work, and Future Response Costs." *Id.* (emphasis in original).  The Sixth Circuit emphasized the "resolved their liability" language, noting that the ASOAC "explicitly state[s] that Appellants have resolved their liability."  Similarly, here, the AOCs explicitly state that the PRPs have resolved their liability to the EPA.

Second, the Orlando and Sanford AOCs have nearly identical contribution protection provisions as the *Hobart* ASAOC.  The Orlando and Sanford AOCs provide, in relevant part, that the PRPs "are entitled to protection from contribution actions or claims to the extent

-8-

provided by §s 113(f)(2) and 122(h))." (Sanford AOC, at 19; Orlando AOC, at 21).  The contribution protection provision in *Hobart* states that the "[t]he parties agree that this Settlement Agreements constitute an administrative settlement .... and that Appellants are entitled, as of the Effective Date, to protection from contribution actions or claims provided by § 113(f)(2) and 122(h)(4) of CERCLA." *Hobart,* 758 F.3d at 769.  Section113(f)(2) provides that "[a] person who has resolved its liability to the United States or a State in an administrative or judicially approved settlement shall not be liable for claims for contribution regarding matters addressed in the settlement."  Thus, as recognized by the Court in *Hobart,* for these contribution provisions to have any meaning and for the PRPs "to receive any protection from contribution actions" the parties must have intended for the AOCs to be administrative settlements under § 113(f).  *Id.*

The Sixth Circuit in *Hobart* also pointed to the contribution provision's reference to § 122 (h)(4) as evidence that the parties must have intended for the ASAOC to be an administrative settlement under § 113(f).  As the court explained, CERCLA's statute of limitation section classifies §122(h), a provision governing cost-recovery settlements, with the other contribution actions.  Here, too, the contribution protection provisions in the Orlando and Sanford AOCs reference § 122(h).

Third, the Orlando and Sanford AOCs state that "notwithstanding compliance with the terms of this Consent Order, the [PRPs ]are not released from liability, if any, for any actions beyond the terms of this Consent Order taken by EPA regarding this Site." (Sanford AOC, at 18; Orlando AOC, at 20) (emphasis added).  Pursuant to the terms of the AOCs, the "actions" that the PRPs were responsible for were 1) the RI/FS work and 2) reimbursing the EPA for any past

and future response costs and oversight costs that it incurred or would incur.  (Sanford AOC, at 13-14; Orlando AOC, at 18-19).  Thus, as First Energy points out, based on this provision, the AOCs released Progress Energy from liability for these "actions" and thereby must have intended to resolve the PRPs' liability to the EPA as to these actions.

Accordingly, the Court concludes that the Orlando and Sanford AOCs are "administrative settlements " under § 113(f)(3)(B).

In attempting to distinguish the *Hobart ASAOC* from the Orlando and Sanford AOC, Progress Energy notes that the PRPs in the AOCs "were not released from liability for actions beyond those required in the consent order."  (Doc. # 85, Opposition to Motion for Reconsideration, at 7).  While this is true, the *Hobart* case clearly states that an "administrative settlement" need only resolve *some* of a PRP's liability to the government.  *See Hobart,* 758 F.3d at 768 (holding that the "defining feature of an 'administrative settlement' is that the agreement resolves the PRP's liability to the United States or a State for some or all of a response action...") (internal quotation and citation omitted).  Progress Energy also notes that, unlike in the *Hobart* ASAOC, the EPA reserved its right to bring an action for recovery of response and oversight costs in the Orlando and Sanford AOCs.  Progress Energy appears to be referring to the following provision: "EPA reserves the right to bring an action against the [PRPs] pursuant to §107 ... for recovery of all response and oversight costs incurred by the United States related to this Consent Order and not reimbursed by [the PRPs], as well as any other past and future costs incurred by the United States in connection with response activities..."  (Sanford AOC, at 19; Orlando AOC, at 21).  The Court disagrees with Progress Energy's contention that this provision suggests that the AOCs were not "administrative settlements."  As noted above, pursuant to the

-10-

terms of the AOCs, the PRPs were required to reimburse the EPA for past and future response and oversight costs.  The fact that the EPA reserved its right to sue if the PRPs did not reimburse the EPA, as required by the agreements, does not mean that the parties did not intend for the AOCs to resolve some of the PRPs liability to the EPA.  Rather, the Court reads the "reservation of rights provision" as simply recognizing the EPA's right to bring a claim if the PRPs did not do what was required of them by the terms of the AOCs.  Finally, Progress Energy takes issue with the covenant not to sue provision of the AOCs.  The covenant not to sue provision in the Orlando and Sanford AOCs is conditioned upon issuance of an EPA "Notice of Completion" and takes effect upon the PRPs reimbursing the EPA for past costs.  (Sanford AOC, at 19; Orlando AOC, at 21).  Progress Energy notes that in *Hobart* the Sixth Circuit distinguished the covenant not sue in the *Hobart ASAOC* from the covenant not to sue in another Sixth Circuit case, *ITT Industries, Inc. v. Borg Warner, Inc.,* 506 F.3d 452 (6th Cir. 2007), where the court held that the agreement at issue (*"ITT* AOC") was not an administrative settlement under § 113(f)(3)(B).  The Sixth Circuit in *Hobart* noted that the covenant not to sue in the *Hobart* ASAOC took effect immediately, whereas in the *ITT* AOC it took effect after payment.  *Hobart,* 758 F.3d at 771.  The Court disagrees with Progress Energy's claim that the covenant not to sue provision in the Orlando and Sanford AOCs suggest that they were not administrative settlements.  As discussed above, many of the provisions in the Orlando and Sanford AOCs expressly provide that the AOCs resolved Progress Energy's liability to the EPA.  Thus, in light of these provisions, the Court does not think that the covenant not to sue provision in the Orlando and Sanford AOCs suggests otherwise.  Furthermore, in *Hobart,* the fact that the covenant not to sue took effect immediately was not part of the court's analysis in determining whether the parties intended for

-11-

the *Hobart* ASOAC to resolve the appellants' liability to the government.  Rather, the Sixth Circuit only recognized that the *Hobart* ASAOC covenant not to sue took effect immediately as an example of how the *Hobart* ASAOC and the *ITT* AOC were factually distinct.

Having determined that the AOCs are "administrative settlements" under § 113(f), the Court must then turn to the question of what impact this has on the applicable statute of limitations.  In *Hobart,* the Sixth Circuit held that § 113(g)(3) sets the proper limitations period for contribution actions, and that the effective date of the administrative settlement is the "triggering event" that commences the statute of limitations period.  *Hobart,* 758 F.3d at 775-76.  Thus, because the limitations period under § 113(g)(3) is three years, a contribution action must be commenced three years from the effective date.  Here, the effective date of the Sanford AOC was the date that the AOC was "received by the [PRPs]."  (Sanford AOC, at 21).  Progress Energy's Vice President and General Counsel signed the Sanford AOC on March 26, 1998 (presumably at or near the time when Plaintiff received the AOC).  As to the Orlando AOC, the effective date was the date that the AOC was "signed by the EPA."  (Orlando AOC, at 22).  The EPA signed the Orlando AOC on September 30, 2003.  Progress Energy filed this action for contribution on December 30, 2011, which is well beyond three years from March 26, 1998 and September 30, 2003.  Therefore, Progress Energy filed this action outside of the limitations period.

### III. Conclusion

In summary, the Court finds that pursuant to the Sixth Circuit's decision in *Hobart* the 1998 Sanford AOC and the 2003 Orlando AOC are "administrative settlements" under § 113(f)(3)(B) and therefore Progress Energy's action is time-barred.  Accordingly, the Court GRANTS First Energy's Motion for Reconsideration (Doc. # 84) and dismisses Progress Energy's claims[3].

**IT IS SO ORDERED.**

        */s/Dan Aaron Polster 10/10/14*
        **Dan Aaron Polster**
        **United States District Judge**

---

[3] As to Progress Energy's claim for declaratory relief for future costs associated with the Sites, the Court also dismisses this claim because Progress Energy cannot recover past costs.  *See City of Colton v. Am. Promotional Events, Inc.,* 614 F.3d 998, 1006 (9th Cir. 2010) (holding that CERCLA declaratory relief as to future response costs is unavailable absent recoverable past costs).