**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **FLORIDA POWER CORPORATION,** | ) | **CASE NO.  1:12-cv-1839-DAP** |
| **d/b/a PROGRESS ENERGY FLORIDA,** | ) | |
| **INC.,** | ) | **JUDGE DAN AARON POLSTER** |
| **Plaintiff,** | ) | |
| | ) | *NUNC PRO TUNC*[1] |
| **vs.** | ) | **OPINION AND ORDER** |
| | ) | |
| **FIRSTENERGY CORP.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

This case is before the Court on two motions.  The first is Duke Energy's Motion for Partial Summary Judgment ("Duke Energy's Motion").  (**Doc #: 106**.)  Therein, Duke Energy contends that Defendant FirstEnergy Corp. is liable, in part, for cleanup costs Duke Energy has incurred in connection with the release of hazardous substances on two properties Duke Energy currently owns in Florida.  For the Court to find FirstEnergy also liable for those costs, Duke Energy must present sufficient evidence to pierce the corporate veil between FirstEnergy's predecessor (a company called AGECO) and the manufactured-gas plants that released those hazardous substances approximately 80 years ago.  If Duke Energy fails to make that showing, then the Court cannot hold FirstEnergy liable for any of Duke Energy's response costs.  Because the parties stipulated, *infra* at 4, that liability is a summary judgment issue in either party's favor, the Court will construe Defendant FirstEnergy Corp.'s Brief in Opposition as a cross-motion for summary judgment on liability.  (**Doc #: 114**.)

---

[1]The Court issues this *Nunc Pro Tunc* Opinion and Order and Judgment Entry in place of the Opinion and Order and Judgment Entry issued on 12/9/2016 (Doc ##: 119, 120) due to grammatical errors occurring on page 5 of Doc #: 119.  The substance and rulings of the earlier Opinion and Order remain entirely the same.

The second motion before the Court is FirstEnergy's Motion for Partial Summary Judgment as to Liability Following the Filing of Bankruptcy on January 10, 1940 ("FirstEnergy's Motion) (**Doc #: 109**).  Therein, FirstEnergy contends that even if the Court finds that Duke Energy has pierced the corporate veil and FirstEnergy is liable for response costs, its liability is cutoff on the day AGECO filed for bankruptcy.

For the following reasons, the Court **DENIES** Duke Energy's Motion (**Doc #: 106**) and **GRANTS** FirstEnergy's cross-motion for summary judgment on the issue of liability (**Doc #: 114**).  Furthermore, even if the Court had granted Duke Energy's Motion on liability, the Court would also have granted First Energy's Motion for Partial Summary Judgment following the bankruptcy filing. (**Doc #: 109**.)

## I.    Introduction

Plaintiff Duke Energy Florida ("Duke Energy"), formerly known as Florida Power Corporation d/b/a Progress Energy Florida, Inc., brought this action under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9601 *et seq.*, to recover cleanup costs it has incurred in connection with the release of hazardous substances on two properties in Florida, one in Orlando and the other in Sanford.  At the time of the hazardous releases, between 1929 and 1943, these properties were owned by Florida Public Service Company ("FPSC") and Sanford Gas Company ("Sanford"), respectively.  Although Duke Energy did not release the hazardous substances, the Environmental Protection Agency ("EPA") concluded that as the current owner of the sites, Duke Energy is responsible for the cleanup costs under CERCLA.  Duke Energy is, however, allowed to recoup those costs from

other parties who are also liable under CERCLA.  Defendant FirstEnergy is alleged to be one such party.

The parties agree that the hazardous substances were generated and released onto the properties by FPSC and Sanford, both subsidiaries of Associated Gas & Electric Company ("AGECO").  By Motion, Duke Energy is trying to pierce the corporate veil separating FPSC and Sanford from AGECO, claiming that AGECO dominated the two subsidiaries and should also be liable for the release of hazardous substances.  If AGECO is liable, then Defendant FirstEnergy is liable as a corporate successor to AGECO.

Although Duke Energy has filed 53 exhibits to support its veil-piercing theory, it primarily relies upon two New York district court opinions with somewhat similar facts, along with the expert opinion of Professor Jonathan R. Macey,[2] an expert on the history of AGECO and its subsidiaries – and upon whose opinion the New York district courts relied.  Duke Energy also contends, in an argument reduced to a footnote, that FirstEnergy is collaterally estopped from disputing AGECO's domination and control over FPSC and Sanford because the New York district courts found that AGECO dominated the two New York subsidiaries to such an extent that the corporate veil could be pierced.  (Duke Energy's Mot. at 7 n.4.)  Even if Duke Energy is successful in piercing the corporate veil, FirstEnergy asks the Court to rule that its liability was cut off when AGECO and AGECORP filed for bankruptcy on January 10, 1940 – in other words, when independent trustees began controlling AGECO's operations.

---

[2]Although the Court will cite to Duke Energy's exhibit, Duke Energy and FirstEnergy have both attached the Expert Report of Jonathan Macey as an exhibit (respectively, Doc ##: 107-1, 112-1).

## II.    Procedural Background

Duke Energy filed this cost recovery and contribution CERCLA action against FirstEnergy in the Middle District of Florida for costs related to both the Orlando and Sanford sites. (Doc #: 1 ("Complaint."))  The Florida court transferred the case to the Northern District of Ohio due to lack of jurisdiction over FirstEnergy in Florida.  (Doc #: 32.)  FirstEnergy thereafter moved for judgment on the pleadings arguing that Duke Energy's claims were barred by the applicable statute of limitations.  (Doc #: 56.)

The Court initially denied the motion.  (Doc #: 59.)  FirstEnergy subsequently moved for reconsideration following the Sixth Circuit's decision in *Hobart Corp. v. Waste Management of Ohio, Inc.*, 758 F.3d 757 (6th Cir. 2014).  (Doc #: 84.)  The Court then reversed itself and dismissed Duke Energy's claims.  (Doc #: 88.)  On appeal, the Sixth Circuit held that Duke Energy's claims were <u>not</u> barred by the statute of limitations, and remanded for further proceedings.  (Doc #: 96.)  *Florida Power Corp. v. FirstEnergy Corp.*, 810 F.3d 996, 999 (6th Cir. 2015).

Following remand, the Court held a teleconference with counsel during which they agreed to undergo private mediation.  (Minutes of Proceedings 1/6/16.)  When mediation failed, the Court held a teleconference with counsel to determine how best to move forward.  (Doc ##: 99, 100.)  Based on those discussions, the Court scheduled a bench trial, no longer than five days, beginning on September 26, 2016.  (Id.)  Counsel agreed on a deadline for filing a joint statement of key disputed facts, as well as a joint proposal on how to try the case.  (Id.)

After reviewing the key disputed facts and the joint proposal for trial procedure (respectively, Doc ##: 102, 103), the Court held a teleconference with counsel to discuss the

-4-

problems attendant to trying the case – given that the salient facts occurred nearly 80 years ago, there are few, if any, living persons with firsthand knowledge of Sanford or FPSC's inner workings, a key disputed "fact" is actually a legal argument involving collateral estoppel, and the trial would mostly be a battle of the parties' experts.  Counsel agreed with the Court's assessment and decided to give mediation another try.  (Minutes of Proceedings 7/13/16.)

When private mediation again failed, counsel requested a teleconference with the Court that was held on August 25, 2016.  (Doc #: 104.)  At that time, counsel agreed that the question of liability could be resolved entirely on paper, proposed a briefing schedule, and stipulated that there are no material factual issues to be resolved.  (Id. at 1-2.)  Counsel also agreed that, if the Court ruled in Duke Energy's favor, FirstEnergy would not challenge the reasonableness and necessity of Plaintiff's recent settlement with the EPA and that the parties probably would be able to settle the allocation of damages.  (Id. at 2.)  Perhaps most important, counsel agreed that, should the parties appeal the Court's decision on any of the issues being briefed, neither side would contend that there are any material disputed issues of fact.  (Id.)  In other words, the parties agreed that the question of liability is a summary judgment issue for one side or the other in the district court and in the appeals court.  Based on these agreements, the Court cancelled the September 7, 2016, bench trial and is now prepared to issue its rulings.

//

//

//

-5-

## II.     Substantive Background

### A.     FPSC and Sanford

This case involves two Florida-based manufactured-gas plants, one located in

Orlando and the other located in Sanford:

> [F]rom 1929 until 1943, [FPSC] owned the Orlando site and operated the
> manufactured-gas plant there.  At the time, FPSC was a wholly owned subsidiary of
> Gen Gas, a public utility holding company.  Gen Gas, in turn, was a subsidiary of
> Associated Gas & Electric Corporation, ("AGECORP"), which was itself a
> subsidiary of AGECO, the predecessor company of Defendant FirstEnergy.

(Doc #: 107-1 ("Plaintiff's Ex. 1, Expert Report of Jonathan Macey" [hereinafter "Macey"])

¶ 12.)  The Sanford site was originally city-owned, and "[o]n March 31, 1928, Sanford Gas

purchased the Sanford Site."  (Id. at ¶ 14.)

In the early 1920s, W.S. Barstow & Company ("Barstow"), a utility engineering and

management company which contracted with its gas operating subsidiaries, acquired several

central Florida utility companies, including FPSC, and began to manage and operate the Orlando

site.  (Macey ¶ 12.)

> Barstow also owned Gen Gas.  Upon its acquisition by Barstow, FPSC
> became a wholly owned subsidiary of Gen Gas.  On February 5, 1929, AGECO
> purchased Barstow.  Upon AGECO's acquisition of Barstow, Gen Gas came under
> the control of AGECORP . . . .  AGECORP was a direct subsidiary of AGECO.
> Thus, by 1929, AGECO owned FPSC.
>
>                    . . . .
>
> By the end of 1930, Gen Gas had acquired all 190 outstanding shares of
> Sanford Gas.  Since AGECO owned Gen Gas via the 1929 Barstow purchase,
> AGECO ipso facto owned Sanford Gas from the end of 1930 to 1943.

(Macey at ¶¶ 13, 15.)

-6-

## B.    The AGECO Empire

AGECO was incorporated as a public utility holding company in 1906.  (Motion 2.)  "In 1922, Howard Hopson, a man who has become an iconic felon among those who study corporate governance and corporate fraud[,] acquired control of AGECO along with John I. Mange." (Macey ¶ 29.)  By 1929, AGECO was the principal holding company and ultimate parent of over 200 power and transportation companies.  (Id. at ¶ 16.)

> AGECO's assets consisted primarily of the stock of its single subsidiary, AGECORP.  AGECORP's assets consisted primarily of the stock of its subsidiaries, which included Gen Gas.  Gen Gas's assets consisted primarily of the stock of its operating companies, which included FPSC and Sanford Gas.

(Id. at ¶ 17.)  "Over time, AGECO became the 'poster child' for the abusive practices of certain public utility holding companies."  *Rochester Gas & Electric Corp. v. GPU, Inc.*, No. 00-CV-6369, 2008 WL 8912083, at *2 (W.D.N.Y. Aug. 8, 2008), *aff'd*, 355 F. App'x 547 (2d Cir. 2009) [hereinafter "*RG & E*"].  Hopson and Mange not only owned all of AGECO's voting stock, but they also "exercised control over the boards of AGECO and its subsidiaries by holding their respective directors' undated signed resignations."  (Id. at ¶ 43.)

Unsurprisingly, AGECO was investigated by a number of government entities beginning in the 1930s.[3]  The Securities and Exchange Commission ("SEC") began proceedings in or around 1937 to divest AGECO of its monopoly over power generation.  (Macey ¶ 18.)  "On January 10, 1940, AGECO and AGECORP filed voluntary petitions for their reorganization under Chapter X of the Bankruptcy Act."  (Id. at ¶ 18.)  Upon filing for bankruptcy, Hopson and

---

[3] Duke Energy included these investigations as exhibits.  (Doc ##: 107-3, 107-4 ("Plaintiff's Ex. 3, Brewster Opinion of the State of New York's Public Service Commission.")) (Doc #:107-5 (("Plaintiff's Ex. 4, Federal Power Commission Report.")) (Doc #: 107-6 ("Plaintiff's Ex. 5, Federal Trade Commission Report.")) (Doc #: 107-7 ("Plaintiff's Ex. 6, Securities and Exchange Commission Report.")).

-7-

Mange lost voting control of AGECO, and three trustees were appointed by the court to control AGECO and AGECORP during the bankruptcy.  (Doc #: 109-1 ("FirstEnergy's Motion") 5.) The trustees also controlled all of the assets of the various AGECO subsidiaries.  (Id.)  The SEC approved a reorganization plan in April 1944.  (Id.)  "The court confirmed the plan in August 1945 and ordered it consummated in January 1946.  The bankruptcy formally concluded on February 6, 1946."  (Id. (citing *New York State Electric & Gas Corporation v. FirstEnergy Corporation*, 808 F. Supp. 2d 417, 432 (N.D.N.Y. 2011), *aff'd in part and rev'd in part*, 766 F.3d 212 (2d Cir. 2014) [hereinafter "*NYSEG*."]))

After the reorganization, FPSC and Sanford merged into Florida Power Corporation, now Duke Energy, the Plaintiff herein.  (Macey ¶ 18.)  In January 1946, AGECORP merged into AGECO, and the consolidated surviving company was General Public Utilities Corporation ("GPU").[4]  (Id. at ¶ 20.)  "On September 27, 1946, Gen Gas, formerly a wholly owned subsidiary of AGECO, was dissolved, and its assets and liabilities were distributed to [GPU]," who then became Gen Gas's corporate parent as a result of the restructuring.  (Id. at ¶ 21.)  Thus, the former FPSC and Sanford sites became liabilities of GPU.  (Id. at ¶ 24.)  In 2001, GPU merged with FirstEnergy, the Defendant herein.  (Id. at ¶ 23.)

Moving forward, the EPA discovered hazardous substances in the 1990s at the sites once occupied by FPSC and Sanford.  *See Florida Power Corp.*, 810 F.3d at 999.  With the authority given to them via CERCLA, the EPA concluded, after investigation, that Duke Energy, among others, was liable for costs associated with removal and remediation of the contamination.  *Id.*

---

[4]"In 1996, General Public Utilities Corporation changed its name to GPU, Inc."  (Macey ¶ 21.)

Duke Energy entered into an "Administrative Order by Consent for Remedial Investigation/Feasibility Study" with the EPA for the Sanford site in 1998 and for the FPSC site in 2003 [hereinafter "the Agreements"].  *Id.*

Under the Agreements, Duke Energy was to conduct an investigation for each site to determine the nature and extent of the public safety threat, and then identify and evaluate options for remedial action.  *Id.*  Duke Energy also agreed to pay the EPA for past response costs it had incurred at the sites.  *Id.*

> The EPA entered three Records of Decision-in 2000, 2001, and 2006.  On January 16, 2009, the U.S. District Court for the Middle District of Florida approved a consent decree between [Duke Energy] and the EPA for actual performance of remediation at the Sanford site.  Regarding the Orlando site, [Duke Energy] submitted a draft Remedial Investigation Report, Risk Assessment, and Remedial Alternative Technical Memorandum that was under review by the EPA at the time of this litigation.

*Id.*  Thus, Duke Energy became liable for the clean-up costs of hazardous substances at the FPSC and Sanford sites, which brings us now to the present action.

### III.    Standard of Review

Summary judgment will be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed.R.Civ.P. 56(a).  The parties have stipulated that there are no disputed questions of material fact, and that the Court should resolve their dispute by granting summary judgment to one party or the other.  (Doc #: 104.)  And, as discussed *supra* at 4, counsel have stipulated that, should the parties appeal the Court's rulings, neither side will contend that there are material disputed issues of fact.

-9-

## IV.    Law and Analysis

### A.    Cross Motions on Liability (Doc ##: 106 and 114)

"CERCLA 'facilitates cleanup and remediation of contaminated lands, and shifts the financial burden of such environmental response actions to the parties responsible for releasing hazardous substances.'" *Florida Power Corp.*, 810 F.3d at 1000 (quoting *ITT Indus., Inc. v. BorgWarner, Inc.*, 506 F.3d 452, 456 (6th Cir. 2007)).  Once the EPA identifies a contaminated site and enters into an agreement with the potentially responsible party to compensate the government for its response costs, a party who has assumed responsibility for the site may sue for contribution of cleanup costs from other potentially responsible parties.  42 U.S.C. § 9613(f)(1), (f)(3)(B); *see also Florida Power Corp.*, 810 F.3d at 1000.

"To establish a prima facie case for cost recovery under CERCLA, a plaintiff must prove that: (1) a polluting site is a "facility" within the statute's definition; (2) the facility released or threatened to release a hazardous substances; (3) the release caused the plaintiff to incur necessary costs of response; and (4) the defendant falls within one of four categories of potentially responsible parties." *Vill. of Milford v. K-H Holding Corp.*, 390 F.3d 926, 933 (6th Cir. 2004).   Potentially responsible parties include: current owners or operators of a contaminated facility, owners or operators of a facility at the time hazardous substances were disposed, any person who arranged for disposal of such hazardous substances at a facility, and any person who accepted such hazardous substances for transport to disposal or treatment facilities.  42 U.S.C. § 9607(a)(1)-(4); *see also Florida Power Corp.*, 810 F.3d at 1000.

The parties stipulate that elements one and two of CERCLA cost recovery liability have been met.  (Joint Stipulation ¶¶ 3–4.)  And while the third element has not been stipulated, it is

undisputed that Duke Energy incurred the costs of responding to the hazardous sites via the 1998 and 2003 Agreements. Therefore, the only issue is whether FirstEnergy is a potentially responsible party. The parties stipulate that Duke Energy is not seeking to impose "direct owner/operator" liability under CERCLA. (Id. at ¶ 1.) Rather, Duke Energy seeks to impose liability on FirstEnergy under an indirect theory of liability by piercing the corporate veil. FirstEnergy will be a potentially responsible party and liable for cost recovery contribution under CERCLA if FPSC and Sanford's corporate veil can be pierced thereby reaching AGECO, FirstEnergy's predecessor in interest.

Generally, a parent corporation cannot be held liable for acts of its subsidiary unless the corporate veil of the subsidiary is pierced. *Corrigan v. U.S. Steel Corp.*, 478 F.3d 718, 724–25 (6th Cir. 2007). "[I]n extraordinary cases, such as the corporate form being used for wrongful purposes, courts will pierce the corporate veil and disregard the corporate entity, treating the parent corporation and its subsidiary as a single entity." *Id.* (citing *United States v. Bestfoods*, 524 U.S. 51, 62 (1998)).

When deciding whether to pierce the corporate veil in a CERCLA case, the Sixth Circuit has determined that the Court must look to state law. *Longhi v. Animal & Plant Health Inspection Serv.*, 165 F.3d 1057, 1061 (6th Cir. 1999); *see also Whelco Indus., Ltd. v. United States*, 526 F. Supp. 2d 819, 826 (N.D. Ohio 2007) (recognizing that the Sixth circuit applies state law to corporate veil-piercing analyses). Because the parties dispute whether New York or Florida's veil-piercing standards should apply, the Court will look to Ohio choice-of-law principles.

-11-

When confronted with a choice-of-law issue in a tort action, the Ohio Supreme Court has adapted the approach set out by the *Restatement (Second) of the Law of Conflicts* under which "a presumption is created that the law of the place of the injury controls unless another jurisdiction has a more significant relationship to the lawsuit."  16 Ohio Jur. 3d Conflict of Laws § 46; *see also Byers v. Lincoln Elec. Co.*, 607 F. Supp. 2d 840, 844 (N.D. Ohio 2009); *AT & T Glob. Info. Sols. Co. v. Union Tank Car Co.*, 29 F. Supp. 2d 857, 865 (S.D. Ohio 1998).

> In determining which state has the most "significant relationship" to a plaintiff's tort claim, Ohio courts examine the following factors: "(a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered."  These factors "are to be evaluated according to their relative importance with respect to the particular issue."

*Byers*, 607 F. Supp. 2d at 844 (citations omitted).

The Court will apply Florida law since FPSC and Sanford operated in Florida throughout their existence and their contamination caused significant toxic injury to Florida real estate.  This ruling is consistent with other district courts that have held that "states have a special interest in exercising judicial jurisdiction over those who contaminate their native soils in violation of CERCLA."  *AT & T*, 29 F. Supp. 2d at 866 (quoting *Mesiti v. Microdot, Inc.*, 739 F.Supp. 57, 61 (D.N.H. 1990)).

Under Florida law, three elements must be met to "pierce the corporate veil."  Duke Energy must prove that (1) AGECO dominated and controlled FPSC and Sanford to such an extent that their independent existence was in fact non-existent, (2) the corporate form must have been used fraudulently or for an improper purpose, and (3) the fraudulent or improper use of the corporate form caused injury to FPSC and Sanford.  *Molinos Valle Del Cibao, C. por A. v. Lama*,

-12-

633 F.3d 1330, 1349 (11th Cir. 2011).  The corporate veil may be pierced "in only the most

extraordinary cases."  *Court-Appointed Receiver*, 2011 WL 1232986, at *6.

While some courts have held that piercing the corporate veil requires persuasive evidence

under Florida law, *Court-Appointed Receiver of Lancer Offshore, Inc. v. Citco Grp. Ltd*, No. 05-

60055-CIV, 2011 WL 1232986, at *6 (S.D. Fla. Mar. 30, 2011), there appears to be no uniform

burden-of-proof standard for corporate veil-piercing:

> While there is no uniform standard, there is authority that a party seeking to pierce
> the corporate veil may only recover from a shareholder if the party proves by a
> preponderance of the evidence that the corporate form was so ignored, controlled,
> or manipulated that it was merely the instrumentality of another and that the misuse
> of the corporate form would constitute a fraud or promote injustice.  However, there
> is other authority that a claimant seeking to pierce the corporate veil must make a
> clear and convincing showing that each consideration has been met.  Further, there
> is yet other authority that the appropriate standard of proof for piercing the corporate
> veil is, if not a clear and convincing evidence standard, at least somewhat greater
> than merely a preponderance of the evidence standard.

18 C.J.S. Corporations § 40 (2016).  Moreover, as claims of fraud must generally be established

by clear and convincing evidence and a showing of fraud is required to pierce the corporate veil,

the Court applies the clear and convincing evidence standard to the second (fraud) element for

piercing the corporate veil.  *See Biscayne Boulevard Properties, Inc. v. Graham*, 65 So. 2d 858,

859 (Fla. 1953) ("We have held many times that fraud can be established only by clear and

convincing evidence. . . .").

As an initial matter, Duke Energy contends that FirstEnergy is collaterally estopped from

disputing AGECO's domination and control over FPSC and Sanford, the first element required

to pierce the corporate veil, based on the rulings in *RG & E* and *NYSEG*.  (Mot. fn. 4.)

FirstEnergy and its immediate predecessor, GPU, Inc., were parties to both actions, and in both

cases, the district courts held, and the Second Circuit affirmed, that the corporate veils between

-13-

the New York subsidiaries and AGECO could be pierced.  *RG & E*, 2008 WL 8912083, at *30,

*aff'd*, 355 F. App'x at 551; *NYSEG*, 808 F. Supp. 2d at 501, *aff'd*, 766 F.3d at 226.

Before collateral estoppel may be applied to bar litigation of an issue, four requirements

must be met:

> (1) the precise issue must have been raised and actually litigated in the prior
> proceedings; (2) the determination of the issue must have been necessary to the
> outcome of the prior proceedings; (3) the prior proceedings must have resulted in a
> final judgment on the merits; and (4) the party against whom estoppel is sought must
> have had a full and fair opportunity to litigate the issue in the prior proceeding.

*Georgia-Pacific Consumer Prod. LP v. Four-U-Packaging, Inc.*, 701 F.3d 1093, 1098 (6th Cir.

2012) (quoting *Cobbins v. Tenn. Dep't of Transp.*, 566 F.3d 582, 589–90 (6th Cir.2009)).

Duke Energy cannot establish collateral estoppel.  The question in this case, whether

AGECO dominated and controlled FPSC and Sanford to such an extent that their independent

existence was in fact non-existent, was not before the New York district courts in *RG & E* or

*NYSEG*.  Thus, the determination of the present issue was not necessary to the outcome of the

New York proceedings, and FirstEnergy did not have a full and fair opportunity to litigate this

issue in the New York courts.

To determine whether AGECO dominated and controlled FPSC and Sanford to such an

extent that the subsidiary was no longer independent, courts have looked at several factors, such

as whether:

> (1)    the parent corporation owns all or majority of the capital stock of the
>        subsidiary;
> (2)    the parent and subsidiary corporations have common directors or officers;
> (3)    the parent corporation finances the subsidiary;
> (4)    the parent corporation subscribes to all the capital stock of the subsidiary or
>        otherwise causes its incorporation;
> (5)    the subsidiary has grossly inadequate capital;

-14-

(6)     the parent corporation pays the salaries or expenses or losses of the subsidiary;
(7)     the subsidiary has substantially no business except with the parent corporation or no assets except those conveyed to it by the parent corporation;
(8)     in the papers of the parent corporation, and in the statements of its officers, "the subsidiary" is referred to as such or as a department or division;
(9)     the directors or executives of the subsidiary do not act independently in the interest of the subsidiary but take direction from the parent corporation; and
(10)    the formal legal requirements of the subsidiary as a separate and independent corporation are not observed.

*Netjets Aviation, Inc. v. Peter Sleiman Dev. Grp., LLC*, No. 3:10-CV-483-J-32MCR, 2011 WL

11560026, at *6 (M.D. Fla. June 13, 2011), *report and recommendation adopted in part*, No.

3:10-CV-483-J-32MCR, 2011 WL 11552881 (M.D. Fla. Sept. 27, 2011) (citations omitted).

The histories of FPSC and Sanford demonstrate the overlapping of officers and directors

with AGECO.  For example,

- Mange and Hopson sat on FPSC's board of directors in the early years after the acquisition.

- Frederick S. Burroughs served as a director at FPSC from 1935 until 1938, and during this same period Burroughs also served on the AGECO board of directors, the Rochester Gas & Electric Company's board, and the South Carolina Electric and Gas board.[5]

- In 1940, A.W. Higgins served as President of FPSC, served as a director and office of Sanford, and was a director or officer at three other subsidiaries of AGECO and one company affiliated with AGECO.

- J. F. McKenna was both a director and a Vice-President at FPSC, and McKenna was both a director at and President of Sanford. McKenna was also a director and corporate Secretary at Rochester Gas & Electric.  In sum, McKenna was an officer or director in no less than 147 other AGECO companies, serving as an officer in 138 other AGECO companies and as a director in 97 companies.

---

[5]Rochester Gas & Electric Company and South Carolina Electric and Gas are both AGECO subsidiaries.

-15-

- C. A. Dougherty was an officer or director in 130 AGECO companies, including both FPSC and Sanford where he served as a director, and Rochester Gas & Electric, where he was both a director and Assistant Secretary.

(Macey ¶¶ 43, 68.)

Additionally, FPSC and Sanford regularly used management service companies that were operated by AGECO.  (Id. ¶ 45.)  These service companies performed various tasks that were essential to FPSC and Sanford's operations and finances.  (Id. at ¶ 46.)  Barstow began contracting with FPSC in 1924, and when AGECO purchased Barstow in 1929, Barstow became an AGECO service company.  (Id. at ¶¶ 12–13, 35.)  Barstow continued to provide management and engineering services to the Gen Gas subsidiaries, including FPSC and Sanford, after its acquisition by AGECO.  (Macey at ¶¶ 13, 35.)  In addition to Barstow, primary among the service companies were J.G. White Management Corporation ("White"), and Utilities Purchase and Supply Corporation ("UPSC").  (Id. at ¶ 45.)

Sanford meeting minutes also show that Sanford contracted with the service management companies:

These Sanford Gas Company minutes state that "J.G. White Management Corporation has since August 1, 1930 been rendering to this Company at its request services as general operating manager of the properties of this Company . . . ."

At the same meeting, Sanford Gas entered into a contract with Barstow under which Sanford Gas would continue to employ Barstow, as it had since August 1, 1930, as "general construction manager of its properties with the authority and duties and for the period and upon and subject to the terms and conditions set forth in the form of agreement for construction services submitted at this meeting."

Finally, the Sanford Gas board entered into a third contract during that same meeting with UPSC . . . .  UPSC also performed services for Sanford Gas by providing purchasing services for the companies.

-16-

(Macey ¶¶ 54–56.)

Barstow, White, and UPSC, later merged to form Utilities Management Corporation ("UMC").  (Id. ¶ 41.)  "The FPSC and Sanford Gas board minutes from 1939 reveal that both boards approved the UMC contract on the same day, at the same location, within 30 minutes of one another (10:00am and 10:30am, respectively)."  (Id. at ¶ 59.)  UMC then continued to perform the day-to-day management of FPSC and Sanford.  (Id.)  In fact, FPSC board meetings were sometimes held at UMC's New York offices from 1934 until 1938.  (Id. at ¶ 65.)

Because evidence shows that AGECO owned the majority of FPSC and Sanford's capital stock at the time in question, the officers and directors overlapped and FPSC and Sanford did not act independently from AGECO, the Court finds that Duke Energy has met the first element for piercing the corporate veil, i.e., AGECO dominated and controlled FPSC and Sanford.

The second element, however, must also be met.  Duke Energy must show that the corporate form was used fraudulently or for an improper purpose.  *Molinos Valle Del Cibao*, 633 F.3d at 1349.  To show improper purpose, there must be evidence that the parent company misled or worked a fraud upon its subsidiary during the time period in question.  *See Netjets Aviation, Inc*, 2011 WL 11560026, at *9.  "Such conduct exists where 'the [subsidiary] was a mere device or sham to accomplish some ulterior purpose . . . or where the purpose is to evade some statute or to accomplish some fraud or illegal purpose [during the time period for which the corporate veil is to be pierced].'"  *Int'l Speedway Corp. v. Racing In-Sites, Ltd.*, No. 6:13-CV-15-ORL-36GJK, 2014 WL 2894504, at *7 (M.D. Fla. June 26, 2014) (quoting *Johnson Enters. of Jacksonville v. FPL Group, Inc.*, 162 F.3d 1290, 1320).

It is extremely difficult to show, by clear and convincing contemporaneous evidence, fraudulent conduct that occurred nearly 80 years ago.  And this is where the cases upon which Duke Energy relies parts ways with the facts in this case.  There was plenty of evidence in both *RG & E* and in *NYSEG* that AGECO abused the corporate form around the country, and Duke Energy's expert witness cites that evidence here.  In *RG & E*, the court emphasized its reliance upon contemporaneous reports from three governmental agencies conducting separate investigations all of which found that AGECO used the corporate form to commit a fraud against that New York subsidiary.  *RG & E*, 2008 WL 8912083, at *26 (reports prepared by the SEC, the Federal Power Commission and the Federal Trade Commission).  The district court found that AGECO extracted exorbitant funds from RG & E for services that were never rendered.  *Id.* Likewise, in *NYSEG*, the court relied upon, among other things, the opinion of a state agency and reports prepared by two federal agencies in concluding that AGECO used that subsidiary's corporate form for improper purposes.  *See NYSEG*, 808 F. Supp. 2d at 440–41 (citing the *Brewster* opinion of the State of New York's Public Service Commission, and reports prepared separately by the SEC and the Federal Power Commission).

Duke Energy asks the Court to find that AGECO used FPSC and Sanford for improper purposes based on the findings of fraud in *RG & E* and *NYSEG*.  But there is no evidence of contemporaneous reports by governmental agencies finding that AGECO used FPSC or Sanford for fraudulent purposes.  In fact, there is contemporaneous evidence to the contrary.  In *Meiners v. Florida Public Service Company*, the plaintiff, a minority stockholder, brought suit in 1930 alleging that AGECO and Gen Gas collected from FPSC large sums of money that were unwarranted or excessive for the use of Barstow and UPSC's services, and that AGECO charged

-18-

FPSC excessive interest on loans.  (Doc #: 115-27 ("Defendant's Ex. 56B, *Meiners*, Bill of Complaint") 4.)  The district court found that the sums paid to Barstow and UPSC by FPSC were for services *actually rendered* and that the amounts paid were *reasonable*.  (Doc #: 115-8 ("Defendant's Ex. 38, *Meiners,* Findings of Fact and Conclusions of Law" [hereinafter *Meiner*s]) 4–5.)  While Duke Energy contends that FPSC was forced to take out loans, these transactions were challenged contemporaneously in *Meiners* and the district court found that the loans were reasonable.  (Mot. 26.)  (*Meiners* at 4.)  Furthermore, Duke Energy points to no specific evidence whereby AGECO or any of its actors misled or worked a fraud upon FPSC or Sanford.

Because Duke Energy has not produced any contemporaneous evidence, such as government reports or witness statements, showing that AGECO used Sanford or FPSC for improper or fraudulent purposes, and because the only relevant contemporaneous evidence (*Meiners*) shows otherwise, the Court finds that Duke Energy has not met the second element required to pierce the corporate veil.  Accordingly, Duke Energy's Motion on liability (**Doc #: 106**) is **DENIED**, and First Energy's cross-motion for summary judgment on liability (**Doc #: 114**) is **GRANTED**.

### B.    FirstEnergy's Motion for Partial Summary Judgment (Doc #: 109)

Even if the Court ruled that Duke Energy successfully pierced the corporate veil, the Court would conclude that FirstEnergy's liability for clean up costs would be cut off at the date AGECO and AGECORP filed their bankruptcy petition on January 10, 1940.  While there is sufficient evidence that AGECO dominated and controlled FPSC and Sanford up until the bankruptcy, there is not sufficient evidence to show that AGECO dominated and controlled FPSC and Sanford after AGECO and AGECORP filed for Chapter X bankruptcy.  Duke Energy

suggests that AGECO's acts of domination and control continued after the bankruptcy because it took many years to disentangle AGECO's corporate structure.  (Doc #: 116 ("Duke Energy's Br. in Opp'n") 4.)  Even so, "[p]ublic officers and agencies—the judge, the trustee and the Securities and Exchange Commission—are to dominate the proceedings" in a Chapter X bankruptcy, and the trustees must be "independent."  (Doc #: 110-8 ("Defendant's Ex. 8, Eugene V. Rostow & Lloyd N. Cutler, *Competing Systems of Corporate Reorganization: Chapters X and XI of the Bankruptcy Act*, 48 Yale L.J. 1334 (1939)" [hereinafter Defendant's Ex. 8]) 1336, 1338.)

Thus, Hopson and Mange lost voting control over AGECO with the filing of the bankruptcy petition and discontinued their managerial roles.  *See In re Associated Gas & Elec. Co.*, 61 F. Supp. 11, 24 (S.D.N.Y. 1944), *aff'd*, 149 F.2d 996 (2d Cir. 1945) (noting that Hopson and Mange "exercised voting control of AGECO until January 10, 1940.").  The court-appointed trustees, instead, operated AGECO and AGECORP following the bankruptcy.  *See RG & E*, 2008 WL 8912083, at *16; *NYSEG*, 808 F. Supp. 2d at 444; *In Re Associated Gas & Electric Co.*, 61 F. Supp. at 18.  Furthermore, even if there was evidence of domination and control, the Court is not aware of any evidence of fraud or improper purpose following the filing of bankruptcy as is required to pierce the corporate veil.  In fact, "the trustee is to report on facts ascertained by him pertaining to fraud, misconduct, mismanagement and irregularities" (Defendant's Ex. 8 at 1338), and Duke Energy has not cited any such report.  Because the corporate veil can be pierced "in only the most extraordinary cases," the Court concludes that Duke Energy has not met its burden.

Accordingly, even if the Court ruled that Duke Energy pierced AGECO's corporate veil, it would also conclude that FirstEnergy's liability under CERCLA would be cut off as of January 10, 1940, the date on which AGECO filed for bankruptcy.

## V.    Conclusion

For the foregoing reasons, the Court **DENIES** Duke Energy's Motion (**Doc #: 106**) and

**GRANTS** FirstEnergy's cross-motion for summary judgment on the issue of liability (**Doc #:**

**114**).  Furthermore, the Court notes that even if the Court had granted Duke Energy's Motion on

liability, the Court would also have granted First Energy's Motion for Partial Summary

Judgment following the bankruptcy filing. (**Doc #: 109**.)

**IT IS SO ORDERED.**


*/s/ Dan A. Polster    December 12, 2016*
**Dan Aaron Polster**
**United States District Judge**